Slip Op. 15-58

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| SAMSUNG ELECTRONICS CO., LTD., AND SAMSUNG ELECTRONICS AMERICA, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | Before: Leo M. Gordon, Judge<br><br>Consol. Court No. 13-00098 |

## OPINION

[Motions for judgment on agency record denied; final determination of sales at less than fair value sustained in part.]

Dated: June 12, 2015

Warren E. Connelly, J. David Park, Jarrod M. Goldfeder, and Phyllis L. Derrick, Akin Gump Strauss Hauer & Feld LLP of Washington D.C. for Plaintiff Samsung Electronics Co., Ltd and Samsung Electronics America, Inc.

Daniel L. Porter, James P. Durling, Christopher A. Dunn, Ross E. Bidlingmaier, and Claudia D. Hartleben, Curtis, Mallet-Prevost, Colt & Mosle of Washington, D.C. for Consolidated Plaintiffs LG Electronics, Inc. and LG Electronics USA, Inc.

Jack A. Levy, Myles S. Getlan, James R. Cannon, Jr. John D. Greenwald, Matthew Frumin, and Thomas M. Beline, Cassidy Levy Kent (USA) LLP of Washington, D.C. for Plaintiff and Defendant-Intervenor Whirlpool Corporation.

Douglas G. Edelschick, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC for Defendant United States. With him on the brief were Stuart F. Delery, Assistant Attorney General, Jeanne E. Davidson, Director, Franklin E. White, Jr., Assistant Director. Of counsel on the brief was Joanna V. Theiss, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance for the United States Department of Commerce.

Gordon, Judge: This consolidated action involves a U.S. Department of Commerce ("Defendant" or "Commerce") final determination in the less than fair value investigation of large residential washers from the Republic of Korea. Large Residential Washers from the Republic of Korea, 77 Fed. Reg. 75,988 (Dep't of Commerce Dec. 26, 2012) (final determ. LTFV investigation) ("Final Results"); see also Issues and Decision Memorandum for the Antidumping Duty Investigation of Large Residential Washers from the Republic of Korea, A-580-868 (Dep't of Commerce Dec. 26, 2012), available at http://enforcement.trade.gov/frn/summary/korea-south/2012-31104-1.pdf (last visited thi date) ("Decision Memorandum"). Before the court are the motions for judgment on the agency record of Plaintiffs Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. (collectively, "Samsung"), Consolidated Plaintiffs LG Electronics Inc. and LG Electronics USA, Inc. (collectively, "LG"), and Consolidated Plaintiff Whirlpool Corporation ("Whirlpool"). This opinion addresses Samsung and LG's challenges to the Final Results. See Br. of Respondent Pls. LG Elecs. & LG Elecs. USA in Supp. of their Mot. for J. on the Agency R. (Sept. 27, 2013), ECF No. 43 ("LG Br."); Mem. of Pls. Samsung Elecs. Co., Ltd. & Samsung Elecs. Am., Inc. in Supp. of their Rule 56.2 Mot. for J. upon the Agency R. (Sept. 27, 2013), ECF No. 45 ("Samsung Br."); Def.'s Consol. Resp. to Pls.' Mots. for J. on the Agency R. 1-50 (Feb. 14, 2014), ECF No. 62 ("Def. Resp."); Resp. Br. of Whirlpool Corp. 1-24 (Mar. 7, 2014), ECF No. 68; Reply Br. of Pls. Samsung Elecs. Co., Ltd., & Samsung Elecs. Am., Inc. (Apr. 21, 2014), ECF No. 81 ("Samsung Reply"); Consol. Pls. LG Elecs., Inc.'s & LG Elecs. USA, Inc.'s Reply Br. (Apr. 21, 2014), ECF No. 82. The court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of

the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2012),[1] and 28 U.S.C. § 1581(c) (2012).

Specifically, Samsung argues that Commerce's targeted dumping analysis violates the statute because (1) Commerce's established targeted dumping test uses weighted average prices instead of individual transaction prices and (2) Commerce thereafter applied the average-to-transaction price comparison to all of Samsung's sales rather than a subset of those sales. LG raises similar arguments, albeit with emphasis on different points, and adds that Commerce unlawfully excluded certain home market sales from its model-matching analysis.

For the reasons set forth below, the court denies both motions and sustains the Final Results for each of the issues raised.

### I. Standard of Review

The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States,

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2015). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A West's Fed. Forms, National Courts § 3:6 (5th ed. 2015).

Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-45 (1984), governs judicial review of Commerce's interpretation of the antidumping statute. See United States v. Eurodif S.A., 555 U.S. 305, 316 (2009) (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

## II. Discussion

### A. Targeted Dumping

Commerce calculates a respondent's dumping margin by determining the "amount by which the normal value exceeds the export price or constructed export price of the subject merchandise." 19 U.S.C. § 1677(35)(A). The statute provides three methods for

comparing normal value to export price or constructed export price to make this calculation: (1) average-to-average ("A-to-A"), (2) transaction-to-transaction ("T-to-T"),[2] and (3) average-to-transaction ("A-to-T"). Id. § 1677f-1(d)(1). Under the A-to-A methodology, Commerce compares weighted-average normal values to weighted-average export prices or constructed export prices, whereas under the A-to-T methodology, Commerce compares weighted average normal values to export prices or constructed export prices of individual transactions. 19 C.F.R. § 351.414(b)(1)-(2).

The statute allows for the A-to-T methodology as an exception to the other methodologies. 19 U.S.C. § 1677f-1(d)(1)(A). Specifically, Commerce may apply the A-to-T methodology "if (i) there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or period of time, and (ii) the administering authority explains why such differences cannot be taken into account using" the A-to-A or T-to-T methodologies. Id. § 1677f-1(d)(1)(B). Pricing that meets both conditions is known as "targeted dumping."

Commerce in Certain Steel Nails from the United Arab Emirates, 73 Fed. Reg. 33,985 (Dep't of Commerce June 16, 2008) and Certain Steel Nails from the People's Republic of China, 73 Fed. Reg. 33,977 (Dep't of Commerce June 16, 2008) (collectively, "Nails") adopted a practice for evaluating whether a respondent has engaged in targeted dumping. This so-called "Nails test" begins with two statistical analyses: the "standard

---

[2] Commerce "will use the [T-to-T] method only in unusual situations, such as when there are very few sales of subject merchandise and the merchandise sold in each market is identical or very similar or is custom-made." 19 C.F.R. § 351.414(c)(2).

deviation test" and the "price gap test." If these two tests reveal a pattern of export prices or constructed export prices that differ significantly among purchasers, regions, or period of time, Commerce next considers whether the A-to-A methodology could take into account the observed price differences. Commerce does so by determining whether there is a "meaningful difference" between the results of the A-to-A methodology and the A-to-T methodology. Commerce explained its application of these procedures below:

> In the first stage of the test, the "standard-deviation test," we determined the volume of the allegedly targeted group's sales of subject merchandise that are at prices more than one standard deviation below the weighted-average price of all sales during the POI, targeted and non-targeted. We calculated the standard deviation on a product-specific basis (i.e., by CONNUM) using the POI-wide weighted-average sales prices for the allegedly targeted groups and the groups not alleged to have been targeted. If that volume did not exceed 33 percent of the total volume of a respondent's sales of subject merchandise for the allegedly targeted group, then we did not conduct the second stage of the <u>Nails</u> test. If that volume exceeded 33 percent of the total volume of a respondent's sales of subject merchandise for the allegedly targeted group, on the other hand, then we proceeded to the second stage of the <u>Nails</u> test.

> In the second stage, we examined all sales of identical merchandise (i.e., by CONNUM) sold to the allegedly targeted group which passed the standard-deviat[i]on test. From those sales, we determined the total volume of sales for which the difference between the weighted-average price of sales to the allegedly targeted group and the next higher weighted-average price of sales for a non-targeted group exceeds the average price gap (weighted by sales volume) between the non-targeted groups. We weighted each of the price gaps between the non-targeted groups by the combined sales volume associated with the pair of non-targeted groups that defined the price gap. In doing this analysis, the allegedly targeted sales were not included in the non-targeted group; the allegedly targeted group's weighted-average sales price was compared only to the weighted-average sales prices to the non-targeted groups. If the volume of the sales that met this test exceeded five percent of the total sales volume of subject merchandise to the allegedly targeted group, then we determined that targeting occurred.

If we determined that a sufficient volume of U.S. sales were found to have passed the <u>Nails</u> test, then the Department considered whether the average-to-average method could take into account the observed price differences. To do this, the Department evaluated the difference between the weighted-average dumping margin calculated using the average-to-average method and the weighted-average dumping margin calculated using the average-to-transaction method. Where there was a meaningful difference between the results of the average-to-average method and the average-to-transaction method, the average-to-average method would not be able to take into account such price differences, and the average-to-transaction method would be used to calculate the weighted-average margin of dumping for the respondent in question. Where there was not a meaningful difference in the results, the average-to-average method would be able to take into account such price differences, and the average-to-average method would be used to calculate the weighted-average dumping margin for the respondent in question.

<u>Decision Memorandum</u> at 19-20 (footnote omitted). For a comprehensive explanation of

the <u>Nails</u> test see Judge Restani's discussion in <u>Mid Continent Nail Corp. v. United States</u>,

34 CIT ___, ___, 712 F. Supp. 2d 1370, 1373-79 (2010).

Applying this test, Commerce below concluded that LG and Samsung exhibited a

pattern of export prices or constructed export prices that differ significantly over certain

purchasers, regions, and time periods, and that those differences could not be taken into

account using the A-to-A methodology.[3] Commerce then applied the A-to-T methodology

to all of LG and Samsung's sales. <u>Id.</u> at 20.

---

[3] Commerce in a subsequent proceeding adopted a new targeted dumping methodology that is not at issue in this action. <u>See</u> Issues and Decision Memorandum for the Antidumping Duty Investigation of Xantham Gum from the People's Republic of China, A-570-985, at 23-29 (Dep't of Commerce May 28, 2013), <u>available at</u> http://enforcement.trade.gov/frn/summary/prc/2013-13220-1.pdf (describing the new "differential pricing" analysis) (last visited this date).

### 1. Consistency of the <u>Nails</u> test with the law

The U.S. Court of International Trade ("CIT") has sustained the <u>Nails</u> test as consistent with 19 U.S.C. § 1677f-1(d)(1)(B) on several prior occasions. <u>See, e.g.</u>, <u>JBF RAK LLC v. United States</u>, 38 CIT ___, ___, 991 F. Supp. 2d 1343, 1353-55 (2014); <u>Timken Co. v. United States</u>, 38 CIT ___, ___, 968 F. Supp. 2d 1279, 1290-93 (2014); <u>Mid Continent Nail</u>, 34 CIT at ___, 712 F. Supp. 2d at 1377-79. LG and Samsung maintain, however, that the <u>Nails</u> test violated the statute, primarily because Commerce failed to use individual transaction prices rather than average prices in analyzing export prices. LG Br. at 16-33; Samsung Br. at 2-32.

Section 1677f-1(d)(1)(B) conditions application of the A-to-T methodology on "a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time." 19 U.S.C. § 1677f-1(d)(1)(B)(i). Congress did not modify the phrase "pattern of export prices (or constructed export prices)" with either "weighted average" or "individual transactions." <u>Id.</u> Congress could have used either modifier, but chose not to. This omission is critical because <u>both</u> appear in the immediately preceding segment of the statute. Specifically, Congress defined the A-to-T methodology as "comparing the <u>weighted average</u> of the normal values to the export prices (or constructed export prices) <u>of individual transactions</u> for comparable merchandise." <u>Id.</u> § 1677f-1(d)(1)(B) (emphasis added); <u>see also</u> Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1 at 843 (1994) (providing for "comparison of average normal values to individual export prices or constructed export prices in situations where an [A-to-A] or [T-to-T] methodology cannot account for a pattern

of prices that differ significantly" without specifying "pattern of prices"). This construction

shows that Congress remained silent on whether "a pattern of export prices" means more

specifically "a pattern of <u>weighted average</u> export prices" or "a pattern of export prices <u>of

individual transactions</u>."

     Commerce's decision to use weighted average prices therefore controls here so

long as it is reasonable. And Commerce below provided a reasonable justification for

using weighted averages instead of individual transaction prices:

> [I]n exercising our discretion, we interpret "export prices" (as well as
> "constructed export prices") in [19 U.S.C. § 1677f-1(d)(1)(B)(i)] to mean a
> weighted average of the individual sales prices. In the context of testing to
> see whether purchasers, time periods, or regions have been targeted, the
> relevant price variance, in the Department's view, is the variance in price
> across purchasers, time periods, and regions, not across transactions. For
> this reason, the Department approaches the problem by analyzing the
> variance of the weighted-average sales prices paid by each group.

<u>Decision Memorandum</u> at 20-21 (emphasis in original) (citations omitted). The court must

therefore sustain Commerce's use of average prices instead of individual transaction

prices. <u>See</u> <u>Gold E. Paper (Jiangsu) Co. v. United States</u>, 37 CIT ___, ___, 918 F. Supp.

2d 1317, 1328 (2013) (sustaining as reasonable under <u>Chevron</u> Commerce's use of

average prices instead of transaction prices).

     LG and Samsung nevertheless contend that the use of average prices violates the

plain language of the statute. LG Br. at 16-33; Samsung Br. at 17-20. The court does not

agree. As described above, Congress did not modify "export prices (or constructed export

prices)" in § 1677f-1(d)(1)(B)(i) with <u>either</u> "weighted averages" or "individual transactions"

when defining targeted dumping, even though Congress used both phrases in defining

the A-to-T methodology in § 1677f-1(d)(1)(B). Although LG and Samsung provide numerous textual justifications to support their own interpretation, their view is not the one and only one possible. Congress' silence leaves Commerce with a measure of discretion to craft a targeted dumping analysis that considers average prices instead of transaction prices.

LG and Samsung also argue that Commerce's interpretation is unreasonable. LG and Samsung insist that average prices are inherently distortive and both provide many examples using hypothetical and record data to illustrate the problems they perceive with using average prices instead of transaction prices. To LG and Samsung, averaging prices masks the true nature of the underlying data because it hides variability from one transaction to another. LG Br. at 16-29; Samsung Br. at 9-16, 21-27. LG adds that using average prices could exaggerate the volume of targeted sales, since each averaged group could include higher-priced sales. LG Br. at 25-29. The court again does not agree. The question before the court is whether Commerce's interpretation of 19 U.S.C. § 1677f-1(d)(1)(B)(i) is reasonable, not whether some other approach might produce a different (or even a better) result. Commerce below explained that "[t]he focus of the statute is not . . . on the variation of transaction-specific sales per se, or even on a difference between individual transactions to a particular group." Decision Memorandum at 21. Instead, "the statute is explicitly concerned with export prices that 'differ significantly among purchasers, regions, or periods of time,'" or in other words, differences among the groups of purchasers, regions, or periods of time themselves. Id. 21 (quoting 19 U.S.C. § 1677f-1(d)(1)(B)(i)) (emphasis in original). Id. Commerce applied the Nails test to groups of

sales averaged by individual purchasers, regions, and time periods to measure the degree to which export prices differed among purchasers, among regions, and among periods of time. This approach enabled Commerce "to disregard meaningless variations" between individual transactions "and focus instead on uncovering a pattern of prices among groups." Id. (emphasis omitted).

LG further challenges step two of the Nails test as inconsistent with the statute because, in LG's view, it "ignores" relevant data. LG Br. at 29-33. The court disagrees. The statute requires Commerce to identify a pattern of prices that "differ significantly." The statute does so without describing the thing from which those prices must differ or how great that difference must be. See 19 U.S.C. § 1677f-1(d)(1)(B)(i). Commerce addresses the significant difference requirement in step two of the Nails test by "looking up" from each targeted group's average price to the next-highest non-targeted group and measuring the gap. Commerce reasonably uses these gaps to quantify, in objective mathematical terms, the significance of the price gap associated with the targeted group as compared to the price gaps of non-targeted groups. Commerce in other words does not consider the distance between targeted groups because step two of the Nails test measures the relative significance of the distances between targeted groups and non-targeted groups. See Decision Memorandum at 19-20; see also Issues and Decision Memorandum for the Antidumping Duty Investigation of Certain Steel Nails from the United Arab Emirates, A-520-804, at 12-13 (Dep't of Commerce Mar. 19, 2012) ("Nails Decision Memorandum") (detailing mathematical rationale behind step two of the Nails test). LG claims that Commerce's gap test "ignores" prices below the targeted group's

average price, but just as Commerce observed below, see Decision Memorandum at 21, LG does not show why the significant-difference requirement can only be met by measuring the distance between targeted groups as it prefers.

Finally, LG and Samsung argue that Commerce failed to explain why the A-to-A methodology could not account for the observed price differences in violation of 19 U.S.C. § 1677f-1(d)(1)(B)(ii). LG Br. at 37-39; Samsung Br. at 36-37. Defendant, though, agrees with LG and Samsung that 19 U.S.C. § 1677f-1(d)(1)(B)(ii) requires an explanation, and identifies where Commerce made that explanation in the Decision Memorandum. Def. Br. at 22 (citing Decision Memorandum at 20). This argument is therefore not a Chevron challenge on the question of whether the statute requires an explanation (it does), but instead a challenge to the reasonableness of the explanation provided by Commerce. Commerce below explained that "the A-to-A method does not take into account such price differences because there is a meaningful difference in the weighted average dumping margins when calculated using the A-to-A method and the A-to-T method for both respondents." Decision Memorandum at 20 (emphasis added). Specifically, Samsung's margin increased from de minimis to 9.29% using A-to-T, and LG's margin increased from a proprietary margin to 13.02% using A-to-T. See LG Electronics Final Determination Margin Calculation Memorandum, Att. 2 at 127 (Dep't of Commerce Dec. 18, 2012), CD 320[4]; Samsung Final Determination Margin Calculation Memorandum, Att. 2 at 125 (Dep't of Commerce Dec. 18, 2012), CD 319. Commerce's explanation is reasonable. Cf. Apex

---

[4] "CD" refers to a document contained in the confidential administrative record.

Frozen Foods Private Ltd. v. United States, 38 CIT ___, ___, 37 F. Supp. 3d 1286, 1294-300 (2014) (sustaining similar explanation as reasonable in the context of arbitrariness review, and commenting in dicta that a similar explanation would survive substantial evidence review).

In sum, LG and Samsung's arguments amount to a request that the court order Commerce to redefine targeted dumping as something other than that defined by Commerce. LG and Samsung would prefer that a finding of targeted dumping depend upon the level of variance between low-priced individual export or constructed export prices, and both offer good arguments for why their preferred definition may comport with the statute's language. LG and Samsung's preferred definition is not the only possible way to construe the statute, however. Commerce's Nails test also represents a reasonable interpretation of a silent statutory provision and must therefore be sustained.

## 2. Samsung's subjective considerations

Samsung argues that Commerce "refused to consider any of the numerous factual considerations" behind its pricing strategies, such as rebates and holiday discounts, that led Commerce to find targeted dumping. Samsung Br. at 7-9, 27-32. According to Samsung, "on any given day and in any given locality, Samsung is likely to be charging a wide variety of prices for the same [large residential washer] model. That is simply how the entire consumer electronics industry works." Id. at 9.

Samsung effectively reads an "intent" requirement into the statute, urging the court to remand because it had legitimate commercial justifications for differential pricing that Commerce refused to consider. Section 1677f–1(d)(1)(B), however, only instructs

Commerce to consider export price (or constructed export price) patterns in its targeted dumping analysis. It does not require Commerce to investigate the subjective reasons a respondent may have for pricing its merchandise. Samsung's argument therefore fails under Chevron. See Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States, 38 CIT ___, ___, 990 F. Supp. 2d 1384, 1387-89 (2014); JBF RAK, 38 CIT at ___, 991 F. Supp. 2d at 1353-55.

Similarly, Samsung argues that the Nails test makes it "[i]mpossible" for a respondent to avoid a finding of targeted dumping because it is complex and unpredictable. Samsung Br. at 21-24. Samsung's argument is not persuasive. "The absence of certainty regarding the dumping margins and final assessment of antidumping duties is a characteristic of the retrospective system of administrative reviews designed by Congress." SKF USA, Inc. v. United States, 537 F.3d 1373, 1381 (Fed. Cir. 2008); see 19 C.F.R. § 351.212(a) ("Unlike the systems of some other countries, the United States uses a 'retrospective' assessment system under which final liability for antidumping and countervailing duties is determined after merchandise is imported."). The statute does not specify the methodology Commerce must employ to determine whether a respondent's sales exhibit a pattern of export or constructed export prices that differ significantly among purchasers, regions, or periods of time. Commerce filled that silence with the Nails test, which it had applied several times before commencing this investigation. Samsung's discomfort with a lack of certainty does not undermine the validity of Commerce's Nails test.

The court therefore declines Samsung's invitation for the court to order Commerce to consider factual matter not required or suggested by the statute. See JBF RAK, 38 CIT at ___, 991 F. Supp. 2d at 1355 (Explaining that an "intent" requirement here "would create a tremendous burden on Commerce that is not required or suggested by the statute" (quoting Viraj Group v. United States, 476 F.3d 1349, 1357-58 (Fed. Cir. 2007)).

### 3. Application of the A-to-T methodology to all of LG and Samsung's sales

LG and Samsung both argue that Commerce violated an improperly-withdrawn regulation and the statute when it applied the A-to-T methodology to all of LG and Samsung's sales rather than just those that passed the Nails test. LG Br. at 4-16; Samsung Br. at 32-40.

### a. Withdrawn regulation and exhaustion

Samsung and LG introduce a new argument before the court that was not raised during the investigation. Specifically, Samsung and LG argue that, in 2008, Commerce improperly withdrew 19 C.F.R. § 351.414(f)(2) (2007), which stated that Commerce "normally will limit the application of the [A-to-T] method to those sales that constitute the targeted dumping." Samsung Br. at 32-34; LG Br. at 4-5; see also Withdrawal of the Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations, 73 Fed. Reg. 74,930, 74,930-31 (Dep't of Commerce Dec. 10, 2008) ("Withdrawal Notice"). When it withdrew the regulation, Commerce explained that it "had never performed a targeted dumping analysis" and that it therefore promulgated the regulation "without the benefit of any departmental experience on the issue of targeted dumping." Withdrawal Notice at 74,930. Commerce also explained that "[t]his situation has caused

the [agency] to question whether, in the absence of any practical experience, it established an appropriate balance of interests in the provisions." Id. By withdrawing the regulation, Commerce sought "an opportunity to analyze extensively the concept of targeted dumping and develop a meaningful practice in this area as it gains experience in evaluating such allegations." Id. at 73,930-31.

Samsung and LG argue that Commerce violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 553 (2012), when it withdrew the regulation without notice and comment. Samsung Br. at 32-34; LG Br. at 4-16. LG also argues that the good cause exception to the notice and comment requirement, which Commerce relied upon in the Withdrawal Notice, does not apply here. LG Br. at 5-12. Samsung and LG argue further that Commerce erred in not applying the now-withdrawn regulation, which provided that the agency "will normally limit the application of the [A-to-T] method to those sales that constitute targeted dumping." Samsung Br. at 32-34; LG Br. at 4-16. Finally, Samsung and LG argue that Commerce was required "to limit its application of the" A-to-T method to "only those transactions found to be targeted," and to "determine the amount of dumping, if any, in all other transactions using the" A-to-A method, "unless the [agency] provides an adequate explanation why the situation is not a 'normal' one." Samsung Br. at 34; see also LG Br. at 36, 38. Samsung and LG, however, failed to exhaust any of these arguments.

Samsung and LG admit that they did not raise their arguments regarding the now-withdrawn regulation in their case briefs before Commerce or at any other point during the investigation below. Samsung Br. at 34 n.25; LG Br. at 12-16. Nonetheless, Samsung

and LG ask the court to excuse their failure to exhaust these arguments based upon alleged futility and an assertion that the argument is a pure question of law. Samsung Br. at 34 n.25; LG Br. at 12-16.

The exhaustion requirement applicable to trade cases is rooted in two sources of law that are implicated here: (1) a statute, 28 U.S.C. § 2637(d), which applies to all antidumping and countervailing duty proceedings; and (2) a regulation, 19 C.F.R. § 351.309(c)(2), which applies to case briefs in antidumping and countervailing duty investigations, certain types of reviews, and in other proceedings if Commerce requests written argument. See 19 C.F.R. § 351.309(b).

The statute provides that the court "shall, where appropriate, require the exhaustion of administrative remedies" in civil actions arising from Commerce's antidumping and countervailing duty determinations. 28 U.S.C. § 2637(d). The U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") has recognized limited exceptions where exhaustion would have been "futile" or the matter is a "pure question of law," Itochu Bldg. Prods. v. United States, 733 F.3d 1140, 1146 (Fed. Cir. 2013), because, in the parlance of the statute, "require[ing] the exhaustion of administrative remedies" in these circumstances would not be "appropriate." 28 U.S.C. § 2637(d). Notwithstanding these limited exceptions, the CIT "generally takes a 'strict view' of the requirement that parties exhaust their administrative remedies before . . . Commerce in trade cases." Corus Staal BV v. United States, 502 F.3d 1370, 1379 (Fed. Cir. 2007).

The regulation requires that a "case brief must present all arguments that continue in the submitter's view to be relevant to the Secretary's final determination or final results."

19 C.F.R. § 351.309(c)(2). The Federal Circuit has held that "Commerce's regulations specifically address the exhaustion requirement, as applied to challenges to antidumping determinations, and require a challenger to submit a case brief to Commerce that contains all of the arguments that the submitter deems relevant, 'including any arguments presented before the date of publication of the preliminary determination or preliminary results.'" Corus Staal, 502 F.3d at 1379 (quoting 19 C.F.R. § 351.309(c)(2)); accord Dorbest Ltd. v. United States, 604 F.3d 1363, 1375 (Fed. Cir. 2010) ("Commerce regulations require the presentation of all issues and arguments in a party's administrative case brief."). In short, "parties are 'procedurally required to raise the[ir] issue before Commerce at the time Commerce [is] addressing the issue.'" Dorbest, 604 F.3d at 1375 (quoting Mittal Steel Point Lisas Ltd. v. United States, 548 F.3d 1375, 1383 (Fed. Cir. 2008)) (alteration in original). The Federal Circuit has explained further that the regulatory exhaustion requirement is "not simply a creature of court decision, as is sometimes the case, but is a requirement explicitly imposed by the agency as a prerequisite to judicial review." Corus Staal, 502 F.3d at 1379; see also Fuwei Films (Shandong) Co. v. United States, 35 CIT ___, ___, 791 F. Supp. 2d 1381, 1385 (2011) (Commerce's regulation "carries the force of law and the court cannot simply ignore it."). A violation of Commerce's regulation, therefore, supplies an independent ground for determining that an argument has not been exhausted. See Dorbest, 604 F.3d at 1375 (holding "that Dorbest's failure to raise its issue in its administrative case brief constituted a failure to exhaust administrative remedies" in violation of regulatory exhaustion requirement).

Samsung and LG concede that they filed case briefs before Commerce that failed to raise any arguments regarding Commerce's now-withdrawn regulation. Samsung Br. at 34 n.25; LG Br. at 12-16. Interested parties in other cases, however, raised these arguments at the administrative level. See, e.g., Nails Decision Memorandum at 15-18; Issues and Decision Memorandum for the Antidumping Duty Investigation of Certain Coated Paper Suitable for High Quality Print Graphics Using Sheet-Fed Process from the People's Republic of China, A-570-958, at 21-25 (Dep't of Commerce Sept. 20, 2010), available at http://enforcement.trade.gov/frn/summary/prc/2010-24159-1.pdf (last visited this date). Samsung and LG could have done the same thing, but apparently chose not to do so. Requiring exhaustion here is "appropriate."

LG and Samsung argue that the "pure question of law" and "futility" exceptions should apply here. Neither do. "In order to qualify for the [pure question of law] exception, plaintiff must (a) raise a new argument; (b) this argument must be of purely legal nature; (c) the inquiry shall require neither further agency involvement nor additional fact finding or opening up the record; and (d) the inquiry shall neither create undue delay nor cause expenditure of scarce party time and resources." Corus Stall BV v. United States, 30 CIT 1040, 1050 n.11 (2006) (citing Consol. Bearings Co. v. United States, 25 CIT 546, 553-54, 166 F. Supp. 2d 580, 587 (2001), rev'd on other grounds, 348 F.3d 997, 1003-04 (Fed. Cir. 2003), aff'd on other grounds, 502 F.3d at 1378 n.4. The withdrawn regulation arguments advanced by LG and Samsung are not purely legal; they have two factual components that would require further agency involvement, additional fact finding, and potentially could necessitate a re-opening of the administrative record.

First, the APA expressly provides for waivers of the notice and comment requirement "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). In the Withdrawal Notice, Commerce made a good cause finding that the notice and comment "requirement is impracticable and contrary to the public interest." Withdrawal Notice at 74,931. Although Commerce included the required "brief statement of reasons" for its good cause finding in the Withdrawal Notice, see 5 U.S.C. § 553(b)(B), if LG and Samsung had raised their APA arguments in their administrative case briefs in compliance with 19 C.F.R. § 351.309(c)(2), Commerce would have had an opportunity to explain why, as a matter of fact, good cause existed. By failing to exhaust their administrative remedies, LG and Samsung deprived Commerce of this opportunity.

Second, even if LG and Samsung were to prevail in their APA arguments, the now-withdrawn regulation would not mandate that LG and Samsung receive a different result before Commerce. The now-withdrawn regulation provided that Commerce "will normally limit the application of the [A-to-T] method to those sales that constitute targeted dumping," but the agency retained discretion to deviate from this normal practice in appropriate circumstances. 19 C.F.R. § 351.414(f)(2) (2007) (emphasis added). Thus, in applying the regulation, Commerce still would have to conduct a factual inquiry and exercise its discretion as to whether, under the circumstances of this particular investigation, limiting the application of the A-to-T method to targeted dumped sales would be appropriate. By failing to exhaust their administrative remedies, LG and

Samsung deprived Commerce of the opportunity to: (1) conduct this factual inquiry (which, on remand, could require a re-opening of the administrative record); and (2) exercise agency discretion prior to judicial review. For these reasons, the pure question of law exception to the exhaustion requirement is not applicable here.

The futility exception does not apply either. LG and Samsung argue that Commerce was not likely to agree with their arguments regarding the now-withdrawn regulation because the agency rejected the same arguments in four other proceedings. LG Br. at 13-15; Samsung Br. at 34 n.25. But even "if it is likely that Commerce would have rejected" the arguments regarding the now-withdrawn regulation, "it still would have been preferable, for purposes of administrative regularity and judicial efficiency, for" LG and Samsung "to make [their] arguments in [their] case brief[s] and for Commerce to give its full and final administrative response in the final" determination. See Corus Staal, 502 F.3d at 1380. Compare Fuwei Films, 35 CIT at ___, 791 F. Supp. 2d at 1385 (rejecting plaintiff's assertion of futility defense to exhaustion because plaintiff "could have raised its arguments about potential unreasonable inconsistencies in Commerce's zeroing practice in its administrative case brief"), with Dongbu Steel Co. v. United States, 635 F.3d 1363, 1368-74 (Fed. Cir. 2011) (reaching merits of plaintiff's challenge to zeroing and noting that plaintiff raised the issue at the administrative level).

Finally, LG and Samsung's reliance on Itochu is unavailing. LG Br. at 12, 15. Itochu involved a changed circumstances review, where the respondent "was under no specific requirement to file a case brief" and the provisions of 19 C.F.R. § 351.309(c)(2) did "not apply." Itochu, 733 F.3d at 1145 n.1. In Itochu, the respondent provided comments to the

agency once prior to the preliminary results, and, in the absence of a regulatory exhaustion requirement, the Federal Circuit held that it would have been futile for the respondent to "resubmit" those comments for a second time after the preliminary results when "Commerce was defending [its position] in court at the time" on the grounds that "it had no discretion in the matter because it was constrained by statute to reject [the respondent's] position." Itochu, 733 F.3d at 1146-48. Unlike Itochu, in this case, LG and Samsung had a regulatory obligation to file case briefs containing all of their arguments, they filed case briefs without making any arguments regarding the now-withdrawn regulation, and there is no statute that would have required Commerce to reject the position advanced by LG and Samsung. See Aluminum Extrusions Fair Trade Comm. v. United States, 37 CIT ___, ___, 938 F. Supp. 2d 1337, 1341-42 (2013) (distinguishing Itochu as case that applied futility exception where the statute required Commerce to reject the respondent's argument); Mid Continent Nail Corp. v. United States, 37 CIT ___, ___, 949 F. Supp. 2d 1247, 1260-61 n.10 (2013) (holding that, notwithstanding the "rare circumstances" in Itochu, "[i]ssues that are not addressed in an administrative case brief filed with the agency are generally deemed abandoned").

For these reasons, LG and Samsung failed to exhaust their arguments regarding Commerce's now-withdrawn regulation.

### b. Consistency with the statute

Commerce did not violate the statute when it applied the A-to-T methodology to all of LG and Samsung's sales. Section 1677f-1(d)(1)(B) permits Commerce to apply the A-to-T methodology when "(i) there is a pattern of export prices (or constructed export

prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and (ii) the administering authority explains why such differences cannot be taken into account using" the A-to-A or T-to-T methodologies. 19 U.S.C. § 1677f-1(d)(1)(B). In Commerce's view, this statutory language permitted application of the A-to-T methodology to all of LG and Samsung's sales:

> With respect to the application of the [A-to-T] method to the non-targeted sales, the Department has previously determined that the language of section 777A(d)(1)(B) of the Act does not preclude adopting a uniform application of [A-to-T] comparisons for all transactions when satisfaction of the statutory criteria suggests that application of the [A-to-T] method is appropriate. The only limitations the statute places on the application of the [A-to-T] method are the satisfaction of the two criteria set forth in the statute. When the criteria for application of the [A-to-T] method are satisfied, section 777A(d)(1)(B) of the Act does not limit application of the [A-to-T] method to certain transactions. Instead, the provision expressly permits the Department to determine dumping margins by comparing weighted-average NVs to the EPs (or CEPs) of individual transactions. While the Department does not find that the language of section 777A(d)(1)(B) of the Act mandates application of the [A-to-T] method to all sales, it does find that this interpretation is a reasonable one and is more consistent with the Department's approach to the selection of the appropriate comparison method under section 777A(d)(1) of the Act more generally.

> The respondents' argument that the [A-to-T] method should only be applied to the U.S. sales which are found to be targeted would undermine the determination that a pattern of significant price differences exists under section 777A(d)(1)(B)(i) of the Act. This pattern is initially identified by the petitioner in its targeted dumping allegation when it identifies purchasers, regions or time periods which may be the basis of such a pattern. The Department then employs the Nails test to confirm whether the alleged purchasers, regions or time periods have been targeted based on the weighted-average sales prices to purchasers, regions, or time periods, allegedly targeted or not. Then, under section 777A(d)(1)(B)(ii) of the Act, the Department must explain whether the significant price differences can be taken into account by the [A-to-A] or [T-to-T] methods, and if not, then the Department may apply the [A-to-T] method. If the Department were to apply the [A-to-T] method only to those U.S. sales which pass the Nails test, as argued by the respondents, then this approach would include only part

of the U.S. sales which constitute the identified pattern. In other words, the U.S. sales which pass the Nails test represent only part of the pricing behavior of the respondent, which, in and of themselves, do not constitute the identified pattern which is based on significant price differences between all groups, whether allegedly targeted or not. The identified pattern is defined by all of the respondent's U.S. sales. To consider whether the [A-to-A] or [T-to-T] method can account for only part of the identified significant price differences, and if so, then to apply the [A-to-T] method to only part of the identified significant price differences, would be an incomplete application of the statute.

If Congress had intended for the Department to apply the [A-to-T] method only to a subset of transactions and use a different comparison method for the remaining sales of the same respondent, Congress could have explicitly said so, but it did not. Instead, Congress expressed its intent with the language of section 777A(d)(1)(B), which imposes a general preclusion from using [A-to-T] comparisons and withdraws that preclusion entirely if the two criteria are satisfied. In the absence of a preclusion, the Department is free to apply the [A-to-T] method to all transactions. The Department may choose any method that is appropriate.

Decision Memorandum at 33-34 (citation omitted).

The court agrees. See Apex Frozen Foods, 38 CIT at ___, 37 F. Supp. 3d at 1301-03 (sustaining Commerce's application of the A-to-T methodology to all sales under Chevron.). The statute permits Commerce to "determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values of the normal values to the export prices (or constructed export) prices of individual transactions" when the conditions in § 1677f-1(d)(1)(B)(i) and (ii) are met, without specifying which individual export prices (or constructed export prices). Rather, the statute outlines preconditions that, when met, allow Commerce to apply the A-to-T methodology. The statute's clear language does not prohibit application of the A-to-T methodology to all sales, meaning Commerce's

interpretation governs so long as it is reasonable. Commerce expressed concern that it would not be able to account for a "pattern" if it isolated the A-to-T methodology to only targeted sales. As Commerce explains, a "pattern" of targeted sales may only emerge when observed against a backdrop of non-targeted sales. Commerce also observed that applying the A-to-T methodology to all sales is just like applying the A-to-A and T-to-T methodologies to all sales, its usual practice under the statute. Because Commerce has supplied a reasonable interpretation of a silent statutory provision, the court must sustain under <u>Chevron</u>.

LG and Samsung nevertheless challenge Commerce's refusal to limit application of the A-to-T methodology to targeted sales. LG and Samsung contend that the required explanation of "such differences" in § 1677f-1(d)(1)(B)(ii) refers <u>only</u> to the differences "among purchasers, regions, or periods of time" in § 1677f-1(d)(1)(B)(i). LG Br. at 35-39; Samsung Br. at 36, 38. As a consequence, LG and Samsung argue, "[t]he phrase 'such differences' does not apply to those other transactions that do not have such differences," meaning Commerce may not apply the A-to-T methodology to all sales. LG Br. at 35-37 (emphasis omitted); <u>see</u> Samsung Br. at 36-38. The court disagrees. The preconditions set forth in 19 U.S.C. § 1677f-1(d)(1)(B)(i) and (ii) are just that—preconditions that must exist before Commerce may apply the A-to-T methodology. One of those preconditions requires Commerce to supply an explanation with specified content, as LG and Samsung point out. 19 U.S.C. § 1677f-1(d)(1)(B)(i) and (ii) do not, however, instruct Commerce on how to apply the A-to-T methodology after making its explanation. That language is instead in 19 U.S.C. § 1677f-1(d)(1)(B), which permits Commerce to compare "the

weighted average of the normal values to the export prices (or constructed export) prices of individual transactions" without specifying whether those export prices or constructed export prices must be drawn only from targeted sales. Id. § 1677f-1(d)(1)(B).

LG and Samsung also argue that the statute "creates a strong presumption" for using the A-to-A or T-to-T methodologies because the A-to-T methodology is a "limited exception." See LG Br. at 35; Samsung Br. at 37. As Defendant correctly argues, however, the statute does not specify how often Commerce may use the alternative A-to-T methodology. The statute merely sets forth preconditions that, when satisfied, permit Commerce to use the A-to-T methodology. 19 U.S.C. § 1677f-1(d)(1)(B). The court does not agree with LG and Samsung that the statute's description of the A-to-T methodology as an "exception" limits Commerce's application of the A-to-T methodology once those two conditions are satisfied.

LG quotes statements Commerce made when promulgating the limiting rule regulation in support of its Chevron argument. LG Br. at 36-37; see also Samsung Br. at 27-32. The court must defer to an agency's reasonable interpretation of an unclear statute, however, even if that interpretation reflects a change in policy. Eurodif, 555 U.S. at 316 (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous . . . even after a change in regulatory treatment, which 'is not a basis for declining to analyze the agency's interpretation under the Chevron framework.'" (quoting Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 981 (2005))). An agency "need not demonstrate . . . that the reasons for the new policy are better than the reasons for

the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency <u>believes</u> it to be better, which the conscious change of course adequately indicates." <u>FCC v. Fox Television Stations, Inc.</u>, 566 U.S. 502, 515 (2009) (emphasis in original). Here, Commerce changed its position on the limiting rule in 2008, explaining that it "promulgated [the limiting rule regulation] without the benefit of any departmental experience on the issue of targeted dumping" because it "had never [before] performed a targeted dumping analysis." <u>Withdrawal Notice</u>, 73 Fed. Reg. at 74,930-31. Commerce returned "to a case-by-case adjudication" to allow it "to gain a greater understanding of the issue," <u>id.</u> at 74,931, an effort that led to the <u>Nails</u> test. Commerce in this investigation drew from actual experience with targeted dumping and reasonably explained why applying the A-to-T methodology to all sales served to remedy masked dumping. <u>Decision Memorandum</u> at 33-35 (explaining that applying the A-to-T methodology to all sales "eliminates . . . masked dumping by exposing (1) any implicit masking within the weighted-average U.S. sales price by basing the comparison on the transaction-specific U.S. sales price, and (2) any explicit masking between averaging groups by not providing offsets for negative comparison results"). Commerce's prior interpretation of the statute does not, in the court's view, render its current interpretation unreasonable.

The court understands LG and Samsung's arguments for why it might make sense to limit application of the A-to-T methodology to only those sales constituting the targeted dumping. Where Commerce finds that the conditions in § 1677f-1(d)(1)(B)(i) and (ii) are satisfied, though, Commerce may apply the A-to-T methodology. 19 U.S.C. § 1677f-

1(d)(1)(B). In the end, LG and Samsung identify neither clear statutory language prohibiting Commerce from applying the A-to-T methodology to all sales nor any unreasonableness in Commerce's decision. The court therefore must sustain Commerce's application of the targeted dumping remedy below.

### B. Commerce's exclusion of small top-loading washers from its model-matching analysis of LG's sales

The statute directs Commerce to set normal value at "the price at which the foreign like product is first sold . . . for consumption in the exporting country." 19 U.S.C. § 1677b(a)(1)(B)(i). The statute defines "foreign like product" as "merchandise in the first of the following categories in respect of which a determination . . . can be satisfactorily made":

> **(A)** The subject merchandise and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.
>
> **(B)** Merchandise –
>
>> **(i)** produced in the same country and by the same person as the subject merchandise,
>>
>> **(ii)** like that merchandise in component material or materials and in the purposes for which used, and
>>
>> **(iii)** approximately equal in commercial value to that merchandise
>
> **(C)** Merchandise –
>
>> **(i)** produced in the same country and by the same person and of the same general class or kind as the subject merchandise,
>>
>> **(ii)** like that merchandise in the purposes for which used, and

> **(iii)** which [Commerce] determines may reasonably be compared with that merchandise

Id. § 1677(16). Merchandise falling within these three categories is known as identical merchandise, similar merchandise, and reasonably comparable merchandise, respectively. This statutory hierarchy requires Commerce first to consider identical merchandise. Where a given export sale lacks a corresponding identical home-market sale, however, Commerce must look next to similar merchandise. Where an export sale lacks a corresponding identical or similar home market sale, Commerce then turns to reasonably comparable merchandise. See id. Commerce has developed a "model-matching" methodology for identifying similar and reasonably comparable merchandise. SKF, 537 F.3d at 1375.

Typically, the home market sales data available for model-matching is limited to in-scope merchandise because Commerce only requests that data. This, as LG and Defendant agree, is not the typical case. After LG and Samsung submitted their complete questionnaire responses but before Commerce issued its preliminary determination, Whirlpool asked Commerce to narrow the scope of the investigation. Commerce obliged and amended the scope to exclude washers with vertical rotational axis and a capacity of less than 3.70 cubic feet ("small top-load washers"). This sequence of events left Commerce in the unusual position of having record data of home market sales for both in-scope and non-scope merchandise, since LG had already reported its small top-load washer sales. Commerce ultimately declined to consider LG's small top-load washer data as similar merchandise in its model-matching analysis. Decision Memorandum at 8.

LG argues that Commerce's exclusion of non-scope small top-load washer sales from its model-matching analysis violates clear statutory language under <u>Chevron</u> step one. LG frames the issue as a matter of whether Commerce erroneously added a requirement to the statute that similar merchandise must also meet the scope's physical description. LG Br. at 41-43. Commerce below, though, agreed that the statute is not so limited. <u>Decision Memorandum</u> at 8 ("LG maintains that [§ 1677(16)(B)] provides the Department with the discretion to use sales which have been excluded from the scope of the investigations as foreign like product for model-matching purposes. We do not disagree with this assertion."). The critical legal question is instead whether the statute requires Commerce to examine all merchandise "like" the subject merchandise in materials and use. LG believes it does. According to LG, the statute "explicitly distinguishes" in-scope merchandise from similar merchandise by using the phrase "subject merchandise" in § 1677(16)(B)(i) and the phrase "like that merchandise" in § 1677(16)(B)(ii). To LG, this distinction "can only mean" that similar merchandise "is something other than subject merchandise." LG Br. at 42 (emphasis omitted). LG also points out that Congress explicitly committed the definition of reasonably comparable merchandise to Commerce's discretion. <u>See</u> 19 U.S.C. § 1677(16)(C) (defining reasonably comparable merchandise as that "which [Commerce] determines may reasonably be compared with [the subject] merchandise"). To LG, the lack of any similar phrasing in § 1677(16)(B) means that Congress did not intend to give Commerce the discretion to restrict the universe of sales under consideration for similar merchandise. LG Br. at 43.

LG's reading of the statute may make sense, but it is not the only interpretation possible. "[T]his statute 'is silent with respect to the methodology that Commerce must use to match a U.S. product with a suitable home-market product.'" SKF, 537 F.3d at 1379 (quoting Koyo Seiko Co. v. United States, 66 F.3d 1204, 1209 (Fed. Cir. 1995)) (emphasis added); see also Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1382-84 (Fed. Cir. 2001). Here, the statute defines similar merchandise simply as "[m]erchandise" that meets the requirements contained in § 1677(16)(B)(i)-(iii). Congress did not clarify whether "[m]erchandise" must include in-scope merchandise, or both in-scope and non-scope merchandise. See 19 U.S.C. § 1677(16)(B). Likewise, none of the requirements outlined in § 1677(16)(B)(i)-(iii) say or imply that similar merchandise must include non-scope merchandise. One easy inference to draw from this omission is that "[m]erchandise" includes home market sales of in-scope and non-scope merchandise as LG argues. Unfortunately for LG, however, because Congress in its silence did not foreclose Commerce from interpreting the term "merchandise" differently, the court proceeds with its analysis under Chevron step two.

Commerce explained that including non-scope merchandise in its model-matching analysis would "deviate from its standard practice" and "would have a significant effect on all future investigations and administrative reviews." Decision Memorandum at 8-9. Commerce explained that doing so would also encourage respondents "to strategically select sales of products, even those outside of the scope, that they believe [Commerce] should use for model-matching purposes, in an effort to increase or decrease [dumping] margins." Id. at 9. In any event, Commerce found "no overarching reason to use smaller

top-load washers which do not meet the physical descriptions of the merchandise covered by the scope for model-matching purposes" because "LG has reported home market sales of merchandise covered under the scope of the investigations, which can be accurately compared with sales of subject merchandise, and adjusted for any physical differences affecting price." Id.

LG's straightforward alternative interpretation of the statute has merit, as Commerce itself acknowledged below. Under Chevron step two, however, "an agency's construction need not be the only interpretation or the reading the court would have reached if the question initially had arisen in a judicial proceeding." Koyo, 66 F.3d at 1210. Commerce chose one possible interpretation over LG's preferred interpretation after considering the impact both interpretations would have on future administrative proceedings. LG has not provided a reason for the court to second guess that judgment call. The court must therefore defer to Commerce's reasonable interpretation of the statute.

As a final note, LG insists that Commerce's decision to restrict its model-matching analysis to in-scope merchandise is not a long-standing practice that requires special deference. LG Br. at 25-27. LG, though, asked the court to assess whether Commerce's approach constitutes a permissible construction of the statute, not whether Commerce's approach is consistent with past practice. See id. at 39. Under Chevron, the court must defer to Commerce's reasonable interpretation of a silent statutory provision. Commerce's discussion of its past practice informs the court's assessment of whether Commerce reasonably interpreted the statute, but no more than called for under the

<u>Chevron</u> standard. The court in sustaining Commerce's interpretation of a silent statutory provision here does so with the deference due under the second step of <u>Chevron</u>.

### III. Conclusion

For the foregoing reasons, the court sustains the <u>Final Results</u> for each of the issues LG and Samsung have challenged in their motions for judgment on the agency record. Judgment will be entered accordingly.

     <u>/s/ Leo M. Gordon</u>     
Judge Leo M. Gordon

Dated: June 12, 2015
     New York, New York